UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                     No. 1:23-cr-40

    vs.                                Hon. Jane M. Beckering
                                                  United States District Judge

JOHN DAWOOD DALALY,

        Defendant.
_____/

## **GOVERNMENT'S SENTENCING MEMORANDUM**

Oakland County businessman John Dawood Dalaly paid Rick Johnson, the Chair of the Michigan Medical Marijuana Licensing Board, $68,200 in bribes starting in 2018 to obtain state licensing approval for a medical marijuana startup business Dalaly co-founded ("Company A") and for Johnson's help in Dalaly's attempt to launch a digital payments business for marijuana transactions ("Company B"). Although the payments business never got off the ground, Company A obtained licenses from the Michigan Marijuana Licensing Board ("MMLB") and successfully operated in the state's new multimillion-dollar marijuana market.

When individuals like Dalaly bribe government officials to achieve their goals, they do more than just enrich themselves at public expense. Corruption robs citizens of access to services, exacerbates inequality, and distorts the marketplace. It is a fundamental threat to the rule of law: it erodes public trust in our government institutions, fuels cynicism toward those institutions, and inhibits effective and accountable governance. This case presents an important opportunity to deter others who might be tempted to pay or accept bribes in the future and punish Dalaly for the crime he committed. Dalaly should receive a 30-month term of imprisonment and pay a substantial fine for his role in the offense.

# BACKGROUND

**A. Facts**

The MMLB was a five-member board created by Michigan's 2016 Medical Marijuana Facilities Licensing Act, which allowed dispensaries and other businesses to operate legally for the first time in the State of Michigan. *See* Mich. Comp. Laws § 333.27301 et seq. Under the new law, prospective marijuana businesses had to be qualified by and receive a license from the MMLB, which at the time had both the responsibility for implementing the new law and the power to fully administer it. *See* Mich. Comp. Laws § 333.27302. Three votes were required to approve license applications. *Id.*

Given the potential profits from this new and lucrative industry – which in 2022 generated $2.3 billion in sales in Michigan – many prospective businesses viewed these marijuana licenses as a golden ticket, a way to make a lot of money, especially if they could be among the first to the market. As Michigan's medical marijuana law and regulations were being developed, some businesses sought to limit the number of licenses to be issued by the state – to "keep the sandbox small," in their parlance, to attempt to increase their profits even further. A few like Dalaly were even willing to pay bribes to ensure their licenses were approved and that they could be among the first to the market.

One person willing to accept bribes was Rick Johnson. In 2017, Johnson was appointed to be the Chair of the MMLB. Prior to his appointment, Johnson had a long career in politics, first as a school board member, then as an Osceola County commissioner, and finally in the Michigan House of Representatives. From 2001 to 2004, he served as the Speaker of the House. From 2005 until his appointment to the MMLB he worked as a lobbyist.

Dalaly paid Johnson a total of $68,200 in bribes through Company A and Company B to influence and reward Johnson in connection with his official duties as chair of the MMLB. These payments were a "quid pro quo": the expectation was that, in return for the payments, Company A would get Johnson's vote for a license and Johnson would get the remaining MMLB members to support Company A's application. (R.66: Dalaly PSR, ¶ 110) To disguise the source and nature of the bribes, Dalaly made the payments to a number of LLCs controlled by Johnson. Dalaly and Johnson also falsely claimed the payments were for "services" performed by Johnson's wife.

Specifically, Company A and Company B made the following payments to bank accounts maintained in the names of various companies Johnson controlled, namely JBJ Ranch, LLC; VM Enterprises, LLC; and Common Cents Harvest Farms, LLC:

**Payments to Johnson from "Company A"**

| Date | To | Amount |
|---|---|---|
| 1/2/2018 | JBJ Ranch, LLC | $1,500 |
| 1/31/2018 | JBJ Ranch, LLC | $1,500 |
| 2/28/2018 | JBJ Ranch, LLC | $1,500 |
| 4/3/2018 | JBJ Ranch, LLC | $1,500 |
| 4/30/2018 | JBJ Ranch, LLC | $1,500 |
| 7/3/2018 | JBJ Ranch, LLC | $1,500 |
| 8/6/2018 | JBJ Ranch, LLC | $1,500 |
| 9/10/2018 | JBJ Ranch, LLC | $1,500 |
| 10/2/2018 | JBJ Ranch, LLC | $1,500 |
| 10/22/2018 | JBJ Ranch, LLC | $5,000 |
| 10/31/2018 | JBJ Ranch, LLC | $1,500 |
| 10/31/2018 | JBJ Ranch, LLC | $1,500 |
| 12/3/2018 | JBJ Ranch, LLC | $1,500 |
| 12/24/2018 | JBJ Ranch, LLC | $1,000 |
| 1/7/2019 | JBJ Ranch, LLC | $4,000 |
| 2/13/2019 | JBJ Ranch, LLC | $4,000 |
| | Total | $32,000 |

**Payments to Johnson from "Company B"**

| Date | To | Amount |
|---|---|---|
| 4/28/2018 | VM Enterprises | $1,000 |
| 6/4/2018 | VM Enterprises | $1,000 |

| Date | To | Amount |
|---|---|---|
| 7/6/2018 | VM Enterprises | $1,000 |
| 7/11/2018 | Common Cents Harvest Farms | $20,000 |
| 8/3/2018 | VM Enterprises | $1,000 |
| 9/11/2018 | VM Enterprises, LLC | $1,000 |
| 10/2/2018 | VM Enterprises, LLC | $1,000 |
| 10/29/2018 | VM Enterprises, LLC | $1,000 |
| 12/4/2018 | VM Enterprises, LLC | $1,000 |
| | Total | $28,000 |

Additionally, Johnson took two private flights (Learjet 35 and King Air 200 charters) from Michigan to Canada with Dalaly and others for "field trips" to meet with investors for Company A, who wined and dined with Johnson. The cost of those flights was $8,200.

Dalaly paid these bribes corruptly, that is, with the understanding that they were offered and given to influence or reward Johnson in connection with his official duties as a member and chairperson of the MMLB. In exchange for the bribes, Johnson took several official acts as MMLB chair that supported license applications submitted by Company A, including:

- Seconding and voting in favor of approving Company A for prequalification status in October 2018;

- Seconding and voting in favor of Company A's application for provisioning center licenses in February, March, and April 2019;

- Providing Company A with advance information regarding MMLB rules and eligibility;

- Providing Company A with inside information on other applicants; and

- Providing Company A with information on businesses whose license applications were going to be denied. Company A could use this information to purchase assets related to those failed applicants.

While Company A was making the bribe payments to Johnson, Dalaly frequently contacted Johnson with questions about their application and the process for obtaining Board approval. Johnson used his position and connections within the state's licensing agency to help Dalaly's companies. Dalaly and Johnson met multiple times for lunch in the Lansing area. During those lunches, they discussed the status of Company A's prequalification application and information about the State of Michigan's Department of Licensing and Regulatory Affairs ("LARA"). Johnson provided Dalaly with contact information for individuals at LARA and the status of other applicants. One of Company A's business strategies was to pursue business opportunities with groups who were not going to get approved due to financial or other issues. Johnson provided Dalaly with copies of spreadsheets listing those companies and their contact information. The spreadsheets also included handwritten notations suggesting which companies were best, or should be a priority, for Company A to pursue.

To further conceal the bribes paid by Company A to Johnson, Company A falsely stated on its license applications that it had no financial relationship with Johnson. Johnson failed to disclose his financial arrangements with Company A. Both omissions also violated state law. *See* Mich. Comp. Laws § 333.27305.

Dalaly is a self-employed businessman who is no longer affiliated with Company A or Company B.

**B. The Plea Agreements**

On April 21, 2023, Dalaly pled guilty pursuant to a plea agreement to a felony information charging him with one count of making bribe payments in violation of 18 U.S.C. § 666(a)(2) and 18 U.S.C. § 2. On May 8, 2023, the Court accepted the guilty plea and adjudicated him guilty.

The parties stipulated in the plea agreement that Dalaly paid Johnson $68,200 in cash, gifts, and other things of value and that the payments were made corruptly to influence or reward Johnson in connection with his official duties as a member and Chairperson of the MMLB. (R.3: Dalaly Plea Agreement, PageID.31) When Johnson agreed to accept those cash payments and benefits, he conveyed to Dalaly that he would provide him with information and assistance to help Company A successfully apply for state medical marijuana operating licenses, that he would help expedite the review of Company A's applications, and that he ultimately would support Company A's license applications when he and the other members of the MMLB voted on those applications. (*Id.*, PageID.31-32)

As it pertains to Dalaly's offense conduct, Rick Johnson admitted that he corruptly accepted at least $110,200 in cash payments and other benefits from several different sources, including from Company A, Company B, and Dalaly. (R.2: Johnson Plea Agreement, PageID.15) Johnson also admitted that, while Chair of the MMLB and after he accepted those payments and benefits, he provided valuable non-public information about the anticipated rules and operation of the MMLB and assistance with license application matters to Company A and Company B.

**C. The Presentence Investigation Report**

The presentence report calculated Dalaly's offense level as follows:

| | |
|---|---|
| Base Offense Level: | 12 |
| Specific Offense Characteristic (payment of more than one bribe): | +2 |

| | |
|---|---|
| Specific Offense Characteristic ($68,200 in bribe payments): | +6 |
| Specific Offense Characteristic (bribes to a high-level decision maker) | +4 |
| Acceptance of Responsibility: | -3 |
| Total offense level: | 21 |

Dalaly has no previous criminal convictions, placing him in criminal history category I. The advisory guidelines range before resolution of Dalaly's objections is 37-46 months in prison and a fine of $15,000 to $150,000. The government filed a motion for a two-level downward departure under Guideline § 5K1.1 in recognition of Dalaly's substantial assistance to law enforcement in the investigation and prosecution of another person who has committed an offense. If granted, the offense level becomes 19 and the advisory guidelines range becomes 30-37 months in prison and a fine of $10,000 to $100,000.

## ARGUMENT

### A. Johnson was a Public Official in a High-Level Decision-Making or Sensitive Position.

Dalaly objects to the enhancement pursuant to USSG § 2C1.1(b)(3) for paying bribes to a public official in a high-level decision-making or sensitive position. That provision instructs the Court to increase the base offense level by four "if the offense involved an elected public official or any public official in a high-level decision-making or sensitive position." The commentary defines a "high-level decision-making or sensitive position" as one "characterized by a direct authority to make decisions for, or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." USSG § 2C1.1 cmt. n.4(A). "Examples of a public official in a high-level decision-making position include a prosecuting attorney, a judge, an agency administrator, and any other public official with a similar level of authority." *Id.* Examples of a public official who holds a sensitive position include "a

7

juror, a law enforcement officer, an election official, and any other similarly situated individual." *Id. See, e.g.*, *United States v. Watkins*, 691 F.3d 841, 852-53 (6th Cir. 2012) (affirming application of enhancement where school district employee recommended particular bribe-paying vendor to his supervisor from list of bidders).

Johnson was appointed to the Board and as its Chair by then-Governor Rick Snyder pursuant to state law. Mich. Comp. Laws § 333.27301(2). The MMLB was vested with the power and responsibility for implementing the new marijuana law and the power to fully administer it. Mich. Comp. Laws § 333.27302. That included the power to grant or deny each application for a state operating license, investigate license applicants, investigate all individuals employed by marijuana facilities, enter, and inspect marijuana facilities without a warrant and without notice, investigate violations of the Act, conduct audits of marijuana facilities, and eject or exclude individuals from marijuana facilities. *Id.*

Given these quasi-law enforcement powers and the fact that the MMLB was regulating an industry involving a controlled substance that, with very limited exceptions, previously had been illegal under Michigan law (and still is illegal under federal law), Johnson's role on the MMLB was similar to that of a police officer, one of the positions to which the Guidelines specifically say the enhancement should apply.

In *United States v. Hill*, 645 F.3d 900, 909 (7th Cir. 2011), the court found that a deputy liquor commissioner who had many of the same powers that Johnson had as chair of the MMLB occupied a high-level decision-making or sensitive position. The deputy liquor commissioner had the authority to accept and review applications for liquor licenses and to conduct background checks on applicants. *Id.* at 904. He also had the authority to conduct on-site inspections of businesses that held liquor licenses and issue citations for liquor code violations based upon his

8

interpretation of the code. *Id.* Although the mayor had ultimate authority for the issuance and renewal of licenses, the deputy oversaw and had substantial influence over the process. *Id.* These powers, which are almost identical to the ones wielded by Johnson and the MMLB, led the court in *Hill* to conclude that the deputy liquor commissioner occupied a sensitive position, meriting an enhancement under USSG § 2C1.1(b)(3).

Given the potential size of the marijuana industry, which is currently estimated at $2.3 billion, the value of the licenses approved by the MMLB was enormous. Indeed, that was the very reason some applicants were willing to pay bribes to obtain a license. The value of the licenses alone is a strong indication that Johnson was in a high-level or sensitive decision-making position. For example, in *United States v. Matzkin,* the court upheld the district court's finding that a United States Navy "supervisory engineer and branch head with responsibility for the technical aspects of major procurements" held a sensitive position because he "was involved in decision making on multi-million-dollar Navy contracts and had considerable discretion and influence in these matters." *Matzkin,* 14 F.3d 1014, 1016, 1021 (4th Cir. 1994).

As chair of the MMLB, Johnson had a similar level of authority as an agency administrator, one of the examples provided in the commentary, and exercised "a substantial influence over" its decision-making process. Like the defendant in *Matzkin*, Johnson's position as chair of the MMLB gave him considerable discretion and influence over matters worth a tremendous amount of money.

Dalaly objects that, as one member of a five-member board, Johnson did not have "direct authority to make decisions on for, or on behalf of, the Board." But that is not what is required. Johnson need only have a "substantial influence over the decision-making process," which as chair he undoubtedly had. Moreover, it only took three votes for the MMLB to approve a license.

9

In *Watkins* the Sixth Circuit held that the enhancement applied to a school district employee who supervised security, even though the employee did not directly award the security contracts. *Watkins,* 691 F.3d at 845-46, 852. In that case, the defendant was a technical supervisor who made security vendor recommendations to the school district Chief of Safety and Security, who was the individual ultimately responsible for awarding security contracts. Emphasizing that the enhancement applied to individuals who merely exercise "a substantial influence over the decision-making process," the court held that the enhancement was correctly applied because the defendant recommended certain security vendors and the Chief of Safety and Security relied on those recommendations when awarding contracts. *Id.* at 852. As Chair of the MMLB, Johnson clearly had a "substantial influence" over its decision-making process.

**B. The Bribe Payments to Johnson Should Include the $20,000 "Loan."**

Dalaly argues that the $20,000 payment from Company B to Common Cents Harvest Farms, LLC on July 11, 2018, should not be counted as a bribe because it actually was a loan. He contends that because Johnson initially described that payment as a loan that he intended to repay, it should not be counted as a bribe payment. He concedes that, even if granted, this objection would not change his sentencing guidelines range.

Regardless, his objection should be denied. The $20,000 payment does not bear any of the hallmarks of a true loan. There was no promissory note, no written loan agreement, no maturity date, no repayment schedule, and no interest rate. Company B's bookkeeper did not consider the payment to be a real loan. (R.66: Dalaly PSR, ¶ 21, n.1) Johnson never repaid any of the money and neither Company B nor Dalaly sought repayment from Johnson. Additionally, Johnson told investigators that he invoiced Dalaly one year later making it appear as though the money was for services provided by Johnson, after Dalaly suggested that Johnson could write off the loan as

10

consulting work. (*Id.*, ¶102) Johnson himself admitted in his plea agreement that he accepted a total of $110,200 in bribes—a figure that contains the $20,000 payment from Company B. (R.2: Johnson Plea Agreement, PageID.15)

There is only one logical reason why Dalaly would give Johnson $20,000 with no repayment terms: Johnson was the MMLB Chair and Dalaly desired his continued support and assistance with launching his businesses. There was no preexisting relationship or friendship between Dalaly and Johnson. All of this demonstrates that the $20,000 payment was not a true loan, regardless of how the bribe payer and recipient once characterized the transaction.

### C. A 30-Month Prison Sentence is Appropriate.

Dalaly should serve a 30-month prison sentence. As this Court knows, the statutory maximum prison sentence for paying a bribe to a public official is 10 years, but the sentence ultimately imposed must comply with the pertinent statutory sentencing factors established by Congress and codified at 18 U.S.C. § 3553(a), including:

1. **The Need for the Sentence to Reflect the Seriousness of the Offense, and to Provide Just Punishment.**

Section 3553(a) directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment. These factors are among the most important factors a court considers in a public corruption case and they counsel in favor of a significant prison sentence. Bribery of public officials is a very serious offense because that conduct severely damages the public trust in our government institutions:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabricate of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3:01CR263, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order denying resentencing of former mayor of Bridgeport).

More pointedly, the 26th President of the United States, Theodore Roosevelt, explained to Congress in 1903 that bribery is a threat to the existence of democracy itself:

> There can be no crime more serious than bribery. Other offenses violate one law while *corruption strikes at the foundation of all law*. Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity. There can be no offense heavier than that of him in whom such a sacred trust has been reposed, who sells it for his own gain and enrichment; *and no less heavy is the offense of the bribe giver*. He is worse than the thief, for the thief robs the individual, while the corrupt official plunders an entire city or State.... Government of the people, by the people, for the people will perish from the face of the earth if bribery is tolerated.

Theodore Roosevelt, Third Annual Message to the Senate and House of Representatives (Dec. 7, 1903) (emphasis added) *available at* The American Presidency Project of UC Santa Barbara, https://www.presidency.ucsb.edu/documents/third-annual-message-16.

Here, Dalaly's bribes corrupted the process for the state's issuance of licenses for businesses to operate in a new and lucrative industry and ensured that Rick Johnson worked not in the interests of the citizens of Michigan, but in the interests of Dalaly and his companies. Individuals and businesses that were denied a license by the MMLB now may wonder whether they had a fair and equal opportunity to compete in the industry. Law-abiding qualified applicants who did not have the ultimate insider "on the take" may have struggled with understanding and navigating what became a tedious and lengthy application and approval process. Although the government has no evidence that Johnson's receipt of bribe payments prevented other qualified applicants from ultimately obtain licenses, Dalaly's and Johnson's illegal actions have significantly damaged the trust that law-abiding citizens placed in Johnson's work as Board Chair and in state government.

Moreover, Dalaly's conduct cannot be described as a fleeting or one-time error in good judgment. Dalaly made bribe payments to Johnson no fewer than 25 different times between January 2018 and February 2019. Additionally, Dalaly participated in wining and dining Johnson and flying him on private airplanes on "field trips" to Canada to meet with Company A's investors. The manner in which the payments were disguised reveal that Dalaly was keenly aware that what he was doing was far from legal or appropriate. One does not need a high-priced lawyer to advise against paying a public official money in exchange for an official act like a vote to approve a business operating license. Dalaly's actions depict an individual who operated under the notion that his businesses should take unfair advantage of a corrupt public official whenever the opportunity presents itself and without regard to the economic harm it may inflict on others or the credibility of government institutions.

A 30-month prison sentence would be significant punishment for a 71-year-old with no criminal history and would reflect the gravity of his offense and the need to impose just punishment for his actions. A custodial sentence below the advisory guidelines range or a probationary sentence would fail to account for the harm he has inflicted by furthering public cynicism and distrust of elected officials and government processes.

### 2. The Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public.

The need to deter others from paying and receiving bribes may be the most important factor when sentencing Dalaly for his offense. Corruption crimes threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("[O]ne of the primary objectives' of sentencing elected officials

convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Id.* at 450–51 (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1328 (11th Cir. 2013)); *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa 2017) ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

In this case, both a corrupt public official and some of the business interests who chose to influence him to secure licenses to operate in the medical marijuana industry have been brought to justice. This case presents the opportunity to deter others who might seek to corruptly influence those who serve in state government, either as an elected official or someone appointed to office by an elected official. This Court should send a clear message to those who might bribe public officials to gain an unfair economic advantage over their law-abiding competitors that there is real and serious punishment awaiting them in federal court.

**3. The Sentence Should Include a Substantial Monetary Fine.**

In addition to a lengthy prison sentence, this Court should impose a monetary fine of at least $62,800, which is the total amount of the bribes Dalaly paid to Johnson. In determining the imposition of a fine, the Court should consider the same § 3553(a) factors it considered in fashioning a prison sentence, along with Dalaly's ability to pay a fine, the expected costs to the government of any prison term and term of supervised release, and other pertinent considerations. *See* USSG § 5E1.2(c)(3). Dalaly has the ability to pay a fine of at least $62,800. Moreover, a fine would further deter him and others from criminal conduct, and it would cover some of the costs to the government for his anticipated imprisonment and supervised release.

Respectfully submitted,

MARK A. TOTTEN
United States Attorney

Dated:  August 31, 2023        /s/ Clay Stiffler
CLAY STIFFLER
Assistant United States Attorney

/s/ Christopher M. O'Connor
CHRISTOPHER M. O'CONNOR
Assistant United States Attorney

United States Attorney's Office
P.O. Box 208
Grand Rapids MI 49501
(616) 456-2404
clay.stiffler@usdoj.gov
christopher.oconnor@usdoj.gov